TO: Clerk's Office
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

***********************************
IN RE: APPLICATION FOR WARRANT TO
SEARCH CONTENTS OF CELL PHONE

20-139M
Docket Number

***********************************

SUBMITTED BY: Plaintiff _____ Defendant _____ DOJ ✓
Name: Andrew Wang
Firm Name: USAO-EDNY
Address: _271 Cadman Plaza East
        Brooklyn, New York 11201
Phone Number: 718-254-6311
E-Mail Address: Andrew.Wang2@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES _____ NO ✓
If yes, state description of document to be entered on docket sheet:

_____

_____

_____

**MANDATORY CERTIFICATION OF SERVICE:**
A) ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B)** ___ Service is excused by 31 U.S.C. 3730(b), or by
the following other statute or regulation: _____ ; or C.) ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

2/11/2020                    /s/ Andrew Wang
DATE                         SIGNATURE

---

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered: _____
Judge/Magistrate Judge: _____
Date Entered: _____

**B) If a new application**, the statute, regulation, or other legal basis that
authorizes filing under seal

Ongoing criminal investigation; risk of flight
and evidence destruction

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,**
**AND MAY NOT BE UNSEALED UNLESS ORDERED BY**
**THE COURT.**

DATED: Brooklyn
       2/11/2020              _____ NEW YORK

**U.S. DISTRICT JUDGE/U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE 2/11/2020
_____
                                    DATE

AB:ADW
F. #2019R01233

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE 6S WITH SERIAL NUMBER F71QK0DFGRYD, CURRENTLY LOCATED WITHIN THE EASTERN DISTRICT OF NEW YORK | **To Be Filed Under Seal**<br><br>APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. 20-139 M |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, PATRICK MAGNER, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—

an Apple iPhone 6S with serial number F71QK0DFGRYD—which is currently in law

enforcement possession, and the extraction from that property of electronically stored

information described in Attachment B.

2.      I am Special Agent with the U.S. Department of Homeland Security,

Homeland Security Investigations ("HSI") and have been since June 2017.  As such, I am a

"federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly

authorized by the Attorney General to request a search warrant.  I am a member of the NYC-

JFK Border Enforcement Security Task Force (the "Task Force"), a joint law

enforcement task force between HSI and other law enforcement agencies based at John F. Kennedy International Airport in Queens, New York. The Task Force focuses on narcotics smuggling and financial crimes occurring at and through the New York airports. I have been involved in the investigation of numerous cases involving the illegal importation and distribution of narcotics.

3.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.    The property to be searched is an Apple iPhone 6S, serial number F71QK0DFGRYD, hereinafter the "Device." The Device is currently located in an HSI evidence storage room within the Eastern District of New York.

5.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

1.    The United States, including HSI, is conducting a criminal investigation of KONSTANDINOS SIOMOS and WILLIAM VEGA regarding possible violations of Title 21, United States Code, Sections 841 and 846.

2.    On or about March 31, 2019, MICHAEL PALERMO was found unconscious in a bed at a residence in Queens, New York. PALERMO's father found him and called 911. After emergency medical services arrived and administered an emergency narcotic overdose medication, PALERMO regained consciousness and was taken to a hospital. PALERMO stated

2

to New York City Police Department ("NYPD") officers that he had injected heroin using a hypodermic needle prior to the incident. NYPD officers recovered a hypodermic needle from the scene of the overdose.

3. On or about June 21, 2019, MICHAEL PALERMO was found dead due to an apparent drug overdose. He had been found unresponsive inside of a bathroom at a public park in Whitestone, New York, with a hypodermic needle in his hand. He was transported to a hospital, where he was pronounced dead on arrival. The New York City Office of Chief Medical Examiner concluded that the cause of PALERMO's death was acute intoxication due to the combined effects of heroin, fentanyl and gabapentin.

4. Based on information and belief and the investigation to date, WILLIAM VEGA regularly dealt heroin to MICHAEL PALERMO prior to the latter's death. VEGA has been arrested for narcotics-related offenses on several previous occasions. His most recent narcotics-related arrest occurred on February 27, 2018, at which time he was found in possession of approximately 28 grams of heroin.

5. Phone records indicate that MICHAEL PALERMO and WILLIAM VEGA were in frequent contact during the months leading up to PALERMO's death. For example, between January 1, 2019 and March 31, 2019, there were more than 1,000 calls between a cell phone known to belong to VEGA and a cell phone known to belong to PALERMO.

6. Between May 2019 and the present, an undercover NYPD officer has purchased narcotics from WILLIAM VEGA on more than a dozen occasions at different locations in Queens, New York. To arrange for a transaction, the undercover officer often communicated with VEGA by calling or exchanging text messages with a number belonging to VEGA. During

3

every transaction, VEGA supplied substances containing heroin (at varying levels of purity) in return for cash, and on most occasions, the purchased substance included a detectable amount of fentanyl. To date, the undercover officer has purchased more than 100 grams of substances containing heroin from VEGA.

7.      During some of the undercover purchases, the heroin sold by VEGA was packaged with a specific "stamp" – i.e., a label and/or graphic design to identify the heroin as a unique narcotics "brand." On several occasions, the "stamp" on the heroin used the word "supreme."

8.      WILLIAM VEGA was by himself the first few times he sold heroin to the undercover officer. However, during a narcotics transaction that occurred on July 2, 2019, VEGA was accompanied by an individual later identified as KONSTANDINOS SIOMOS, who appears to be a co-conspirator who is supplying narcotics to VEGA. On that occasion, VEGA and SIOMOS arrived at a previously agreed upon location while driving a black SUV. The undercover officer entered the rear passenger side door and spoke with VEGA and SIOMOS. The undercover officer then handed US $700 in cash to VEGA and observed SIOMOS then give VEGA a package, which VEGA then handed to the undercover officer. The package contained approximately 100 glassines of heroin, weighing about 5 grams in total.

9.      On several other occasions, after the undercover officer handed money to WILLIAM VEGA to purchase heroin, VEGA left the scene of the transaction to meet SIOMOS or other co-conspirators to retrieve the narcotics. For example, on or about July 19, 2019, the undercover officer met with VEGA to purchase narcotics at 47-51 33rd Street in Queens, New York. The transaction took place in a vehicle, and the undercover officer made a video

4

recording of the interaction in which VEGA's face can be clearly seen and the conversation can be clearly heard. The undercover officer handed US $700 in cash to VEGA, who then provided the undercover officer with a bag containing 100 glassines of heroin. Afterward, during the same conversation, VEGA said that he could obtain more heroin but that it would take some time for his "partner" to retrieve it. VEGA then exited the undercover officer's car.

a. After VEGA exited the undercover officer's car, other NYPD officers observed VEGA walk towards and enter a Gray Range Rover parked nearby.

b. After a short time, VEGA exited the Gray Range Rover and returned to the undercover officer's car. VEGA then told the undercover officer that his "partner" would take approximately 25 minutes to get the drugs.

c. After VEGA exited the Gray Range Rover, NYPD officers observed the Gray Range Rover drive to City Closet Storage, a self-storage facility, located at 47-32 32nd Place in Queens, New York (the "STORAGE FACILITY"), about one block away from where the undercover officer was parked. Officers followed the Gray Range Rover to the storage facility, where they saw it was parked and unoccupied. After a period of time, the Gray Range Rover left the facility and parked approximately one block away on 32nd Place between Hunters Point Avenue and 48th Avenue, which is also a short distance away from where the undercover officer was parked.

d. Eventually, VEGA received a text message and told the undercover officer that his "partner" had returned with the narcotics. The undercover officer then handed VEGA an additional US $700 in cash. VEGA then exited the car and was

5

observed walking to the Gray Range Rover.  VEGA then returned to the

undercover officer's car and handed the undercover officer another bag containing

100 glassines of heroin.  In total, the heroin purchased by the undercover officer

from VEGA on July 19, 2019 weighed approximately 8.2 grams.

10.     During the July 19, 2019 transaction, WILLIAM VEGA can also be heard on

video discussing the death of MICHAEL PALERMO.  During that conversation, VEGA said

that VEGA had "supreme shit when [he] was in Whitestone."  VEGA expressly stated that

PALERMO had come to VEGA's home on multiple occasions to purchase heroin.  VEGA also

said that when he sold heroin to PALERMO, he had warned PALERMO not to use too much of

it at one time.  VEGA appeared to express frustration that PALERMO did not follow his advice,

stating that after VEGA had sold the heroin, PALERMO had said "all right, all right, whatever"

and that VEGA found out about the fatal overdose "the next day."  Specifically referring to

PALERMO's fatal overdose and the needle found in PALERMO's arm, in response to the

undercover officer's inquiring "but that was somebody else's shit, or that was your shit," VEGA

admitted, "that was my shit too."

11.     On or about July 30, 2019, August 8, 2019, August 22, 2019, and September 6,

2019, the undercover officer met WILLIAM VEGA to purchase narcotics at the intersection of

36th Street and Queens Boulevard in Queens, New York.  This location is a less than 10 minute

walk from the STORAGE FACILITY.  During each of those transactions, VEGA entered the

undercover officer's parked car, took money from the officer, exited the car, and then returned

sometime later with narcotics.

6

12.     On or about August 8, 2019, shortly before the undercover officer engaged in a narcotics transaction with WILLIAM VEGA, an individual resembling KONSTANDINOS SIOMOS was observed holding a white plastic bag and entering the interior of the STORAGE FACILITY.

13.     On or about September 6, 2019, after WILLIAM VEGA exited the undercover officer's car, VEGA was observed walking to a car parked in front of the STORAGE FACILITY and appeared to be speaking with someone on his phone.  A few minutes later, KONSTANDINOS SIOMOS was observed exiting from the STORAGE FACILITY, meeting with VEGA, and making hand-to-hand exchanges with VEGA.  Afterward, VEGA walked back to the undercover officer's vehicle and gave the officer heroin.

14.     Records obtained from the STORAGE FACILITY show that KONSTANDINOS SIOMOS has been renting a unit there since January 2017 and continued to do so at least through the end of September 2019.  However, continuing law enforcement surveillance efforts indicate that neither VEGA nor SIOMOS has been in the immediate vicinity of the STORAGE FACILITY since September 2019.

15.     Further narcotics purchases made by the undercover officer demonstrate that WILLIAM VEGA and KONSTANDINOS SIOMOS have been distributing narcotics from an apartment located on the third floor of a residential building at 1901 21st Avenue in Queens, New York (the "QUEENS APARTMENT") since at least September 2019.  Specifically, on seven separate occasions between September 2019 and January 2020, the undercover officer purchased heroin from VEGA in the immediate vicinity of the QUEENS APARTMENT.

16.     The most recent purchase of narcotics by the undercover officer from WILLIAM VEGA occurred on January 9, 2020. On that day, the undercover officer drove his vehicle to the intersection of 31st Street and Hoyt Avenue in Queens, New York to meet with VEGA. At that location, VEGA entered the undercover officer's vehicle, and together they drove to 20-52 20th Street, located on the same block as the QUEENS APARTMENT. After the undercover officer handed VEGA approximately US $2,100 in cash, VEGA exited the vehicle. Law enforcement then observed VEGA walk to 19-01 21st Avenue, enter the building, walk up to the third floor, engage in a hand-to-hand transaction with KONSTANDINOS SIOMOS, exit and then return to the undercover officer's vehicle, where he gave the undercover officer 300 glassines of heroin, weighing approximately 18.6 grams.

17.     On February 4, 2020, law enforcement arrested KONSTANDINOS SIOMOS and WILLIAM VEGA pursuant to federal arrest warrants issued by U.S. Magistrate Judge Cheryl L. Pollak. On February 3, 2020, the undercover officer communicated with VEGA via text message to arrange for another narcotics transaction to take place the next day. On February 4, 2020, at approximately 2:00 p.m., the undercover officer and VEGA exchanged text messages regarding their respective locations. At 2:22 p.m., VEGA sent a text message to the undercover officer stating that he was in a cab heading towards the undercover office and would arrive in about 20 minutes. The undercover officer and VEGA then met in person at approximately 2:40 p.m. After the undercover officer handed VEGA approximately US $1,400 in cash, VEGA was observed walking to the QUEENS APARTMENT to obtain narcotics. Law enforcement arrested him at approximately 3:30 p.m.

8

18.     HSI seized the Device, which was on VEGA's person, incident to his arrest. Therefore, while HSI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

19.     Based on the foregoing facts, as well as my training and experience, there is reason to believe that WILLIAM VEGA uses his personal cellular device to communicate with purchasers of narcotics via text message or some form of communication application that involves written messages.  Furthermore, because the Device was found on VEGA's person shortly after he met with the undercover officer on February 4, 2020, there is reason to believe that the Device is the same cellular phone that VEGA used to communicate with the undercover officer to arrange all of their narcotics transactions, including the one scheduled for the day of VEGA's arrest.  There is also reason to believe that VEGA communicates with KONSTANDINOS SIOMOS via text message or written messaging application on his personal cellular device to facilitate the distribution of narcotics. Accordingly, there is probable cause to believe that there is evidence of violations of Title 21, United States Code, Sections 841 and 846 on the Device.

## TECHNICAL TERMS

20.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through

networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

10

c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically

calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

21.    Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as Internet browsers, email clients, electronic messaging

12

devices, telephones, digital cameras, portable media players, GPS navigation devices, and PDA's. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

13

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

14

25. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

27. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. Based on information obtained through this investigation, including from evidence seized and witnesses contacted on the day of WILLIAM VEGA's and KONSTANDINOS SIOMOS's arrests, the investigation is presently targeting several other individuals who are at large and whose identities are known to law enforcement. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation, the scope of which is neither public nor known to all of the targets of this investigation. Premature disclosure of the contents of this affidavit and related documents

may have a significant and negative impact on the continuing investigation and may severely

jeopardize its effectiveness.

Respectfully submitted,

Patrick Magner
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
on February 11, 2020;

HON. LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

16

## **ATTACHMENT A**

The property to be searched is an Apple iPhone 6S, serial number F71QK0DFGRYD, hereinafter the "Device." The Device is currently located in an HSI evidence storage room within the Eastern District of New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 846 and involve WILLIAM VEGA or KONSTANDINOS SIOMOS and their co-conspirators since January 1, 2019, including:

      a.  names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), and messages sent or received on programs or applications with an electronic messaging function;

      b.  evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

      c.  evidence of the times the Device was used;

      d.  passwords, encryption keys, and other access devices that may be necessary to access the Device;

      e.  contextual information necessary to understand the evidence described in this Attachment;

      f.  lists of customers and related identifying information;

      g.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      h.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    i.   any information recording WILLIAM VEGA's schedule or travel from January 1, 2019 to the present, including, but not limited to, evidence regarding VEGA's location specifically on March 30, 2019, March 31, 2019, June 20, 2019 and June 21, 2019; and

    j.   all bank records, checks, credit card bills, account information, and other financial records.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>AN APPLE IPHONE 6S WITH SERIAL NUMBER<br>F71QK0DFGRYD, CURRENTLY LOCATED WITHIN THE<br>EASTERN DISTRICT OF NEW YORK | )<br>)<br>)<br>)<br>)<br>)    Case No.    20-139M |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

**YOU ARE COMMANDED** to execute this warrant on or before _____February 25, 2020_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for ___30___ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    2|11|20 @ 3:38 p.m.      *Lois Bloom*
                                                   *Judge's signature*

City and state:    Brooklyn, New York            Hon. Lois Bloom           U.S.M.J.
                                                            *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

## Return

| Case No.:<br>20-139M | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

The property to be searched is an Apple iPhone 6S, serial number F71QK0DFGRYD, hereinafter the "Device." The Device is currently located in an HSI evidence storage room within the Eastern District of New York.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 846 and involve WILLIAM VEGA or KONSTANDINOS SIOMOS and their co-conspirators since January 1, 2019, including:

      a.  names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, emails (including those sent, received, deleted and drafted), and messages sent or received on programs or applications with an electronic messaging function;

      b.  evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

      c.  evidence of the times the Device was used;

      d.  passwords, encryption keys, and other access devices that may be necessary to access the Device;

      e.  contextual information necessary to understand the evidence described in this Attachment;

      f.  lists of customers and related identifying information;

      g.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

      h.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

     i.   any information recording WILLIAM VEGA's schedule or travel from

January 1, 2019 to the present, including, but not limited to, evidence

regarding VEGA's location specifically on March 30, 2019, March 31, 2019,

June 20, 2019 and June 21, 2019; and

    j.   all bank records, checks, credit card bills, account information, and other

financial records.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2